Application is Ed Wolfe Construction v. Knight, 5-13-0115 Mr. and Mrs. Knight's home in Salem, Illinois, was substantially damaged by fire on Feb. 28, 2008. My client's insurance carrier, State Farm Insurance, has a premier service program through which my clients employ the services of the company, Ed Wolfe Construction. My client, Richard Knight, was presented with a written bid in the approximate amount of $107,000 on March 6, 2008. The following day, Mr. Knight executed an authorization to perform services, authorizing Ed Wolfe Construction to perform services to repair, to perform fire restoration on the home. The same day, he also executed an authorization to repair to State Farm, authorizing them to go ahead and make an initial $30,000 payment to Ed Wolfe Construction. The authorization to repair provided to State Farm indicated that there would be a completion date of August 15, 2008. It relies upon that representation, my client authorized Ed Wolfe to proceed. Work commenced. There were a number of disputes, a number of delays. As of the time of the last punch list meeting on December 17, 2008, work was not completed. January 30, 2009, my client contacted Wolfe Construction and asked them to stop working. Had not the contact been altered as to the amount of add-ons, additions, and applications? There were additional – there was additional work performed. One was some work involving porch, and then there were some allegations of some other work performed as well. However, that kind of gets to, I think, our main point about the court's decision, Your Honor, is whether or not this March 7 authorization document that my client personally only executed, whether or not it was a written contract, trial court found it was. We believe for a number of reasons it wasn't. It had no price term, at least to extend the amount. It had no scope of work. It had no duration. My client had no role in drafting either, and also didn't bear the signature of Luann Knight. The trial court found that it was a written contract, and in the event the trial court was correct, the one term that is clearly specified in that document is that it's a fixed price contract. Our client's bid received the day before the document was executed was roughly $107,000. It appears from the record that that document, which I believe was introduced as Defendants Exhibit 9. Well, was there any other, were there changes made after that money dollar figure was granted, or was it come to, or whatever you want to call it? Well, Your Honor, I mean, I think there were requests for changes, and I think there were some changes made, but after that dollar value had been picked and agreed to. Well, yes, there were changes made. And then was there additional fees, or was it, well, whatever you want to call it, charges? Well, the defendants are claiming that there's an additional roughly $26,000 owed in connection with that. Now, the evidence below will show that this 20, it's 25 of change. This check was actually written initially from State Farm directly to Edward Construction and my client. After reviewing a couple of things, Your Honor, an independent evaluation performed by an engineer and also another independent evaluation performed by Jim Hill Construction. And was this as to the changes or as to the original house that the engineer was going to check? Your Honor, these, this extra $26,000 was only in reference to the original agreement for restoration work.  Right. The porch is a separate matter, and the trial court awarded Edward Construction money for the porch as well. But back to the issue of the State Farm check. State Farm actually changed the payees on the check from Edwards Construction to my clients and its lender after reviewing this additional material. In any event, the trial court actually entered judgment on count one of this complaint, finding a breach of a written contract, which it was a written contract. It was a fixed-term contract, and awarded them the $25,000 check. Despite the evidence in the record, the State Farm changed the payee on the check after reviewing the evidence to pay to my clients. The issue of the porch and the additional work for the porch. There is actually a proposal signed by Rich Knight and Rich Knight alone in a specified sum. There was a dispute. Mr. Knight actually paid a $7,500 deposit. There was a dispute as to the total amount owed. And ultimately, just to mention of the court's satisfaction of the prior argument, my client actually issued a check, payable in what he believed to be the balance due for the work performed on the porch. This was after he got a bill or before? This was after he got a proposal to be signed. And it was more than that check? Pardon me? It had stated it was for more than that check? The proposal didn't state it was for more. My client executed this check and provided it to Wolf for what he believed the full balance would be due. And only indicated clearly on the check that it was final payment for porch work. The check was negotiated. We believe that that does establish an accorded satisfaction on the issue of the porch work. But ultimately, Your Honor. But there was no written contract as to the porch? No written agreement? There is a written proposal. Signed by him only? Signed by Richard Knight only. None of these documents were signed by the man. I'm going to cut the court off, Your Honor. Go ahead and finish your question, sir. Was there any agency of the wife? I don't think that the facts bear that out, Your Honor. But in addition to entering judgment in favor of Wolf on count one and on the issue of the porch, the court also assessed attorney's fees against my client's. So we believe that's an error as well. And in that instance, it's actually an abuse of discretion. Illinois law is pretty clear that typically a written contract or a statute is required for the assessment of attorney's fees. And in this instance, those would have been applicable only to the count associated with the breach of contract action, not to the case as a whole. And would really only be properly assessable against Richard Knight, who signed the documentation, assuming that it did actually amount to a written contract. In other words, the original contract did have attorney fees in it? The original contract, it does have a reference to the cost of collection and for reasonable attorney's fees. So, again, assuming that that is a written contract. So you're saying that any modification or add-ons to the contract, attorney fees do not apply? I would say that's correct. I also would say that they shouldn't apply to any judgment entered against Lou Anne Knight. She wasn't a party to that agreement. Assuming it was, in fact, a written agreement. Our position was and remains that this was basically an authorization to perform services in a workmanlike manner. We don't believe that it actually was done in a workmanlike manner. Even substantial performance was met. They fled alternative theories, breach of contract and quantum merit. Did I read something in this? Did I read something I don't know? Sure. Was there something about the changing of colors or something? And they painted some, they changed some, they painted some, they changed some? How many times did that go on? There were a number. And, Your Honor, I think the record below from the plaintiff's point of view was designed to make the Knights appear to be extraordinarily unreasonable people. And I believe the record below in the plaintiff's case was designed to portray the Knights as very unreasonable people who just simply couldn't be satisfied. How many times did they change the color? I forget what room it was. You're right. It was a number of times. I don't know. That number is how many? I don't recall specifically. Was it, did they paint a whole wall or did they just say, give them a patch and here's the, whatever they call those little tabs that got the colors on it? And say, is this the one you want or is that the one? Or did they paint something and they said, no, I don't like that, paint it again? Is that what they did? I don't know what they did. Judge, I honestly don't remember. I do recall that. Is it in the evidence? We'll see it when we read the record. You will see a lot of evidence about, about discussions, about changes, about Mike Mines being unsatisfied with some of the work being performed. I mean, about the color. I'm just worried about the color. About the color. Judge, I don't want to misquote the record. Give me a number. Was this, that was an independent contractor? Did they have somebody different than the plaintiff here? I mean, the defendant. I don't recall that Wolf's Company specifically. They're not painters. They had some professional painter come in. But, again, Your Honor, I don't want to misstate something that's in the record. We'll find out. Yeah, I understand. But I believe that this did have some persuasive effect on the trial court, and I believe that it caused the judge's opinion to not be based on the evidence only. I mean, there's some somewhat entertaining language used in one of his prior orders where he indicated with the issue of painting, again, that if Mike Mines had been in charge back in the city in 1508, that Mike Mines would still be working on Sistine Chapel. One of my client's witnesses' reports was referred to as being worth nothing more than hiding the bottom of a birdcage. I mean, there's some indicia in the record of a passionate decision on the part of Judge McHaney, not one based solely on the evidence. And when you've got a situation where a state farm claims rep who not only is not hostile to Wolf Construction, indicated they still do business with them, changed the payee on the $26,000 check, which is really the basis for the damages against my client on count one, to my client to make repairs that are necessary following the construction, it seems to me that that is a decision that's not based solely on the evidence. And at least in a couple of instances, a contrary decision is clearly apparent. One is that attorneys' fees, contractual interest should not apply at least to Lou Hanna, who's not – who didn't sign any of his documentation. There's no written agreement to provide for any of that. The other is that this $26,000 is properly the money for the Knights. So the argument is over $26,000? Well, on count one, yes. It's about $15,000 for extra work. The only document to really support extra work is, as I told you, the signed proposal signed by Richard Knight only that we believe was actually satisfied through an important satisfaction. We think there should be no money due to the rule for extra work. And what was that extra work? Was that a porch or something? Yeah, that was a porch. And what was the problem with the porch that they alleged in the complaint? Actually, it was the height of the porch, as I recall. There was some testimony about someone going out and drawing lines. Is this the proper line? And Richard Knight saying, yes, it is. No, it isn't. And how much – how many – was that in feet, inches, or what was it? I believe that was a matter of inches, if I remember correctly, Your Honor. And is this a big porch? The whole front of the house? I'm trying to get a picture. Well, there is actually a photograph in the record at the front of the house. What was in the record? You will see. You will see. It's the porch on the front of the house. Is it a big porch or a little porch? I would say it's a big porch in reference to a house of this size, Your Honor. I think Judge Fuller can hand you the picture. And you're talking about inch in height? I think it was a matter of inches, not feet, Your Honor. And is that coming out the door or from end to end? But bear in mind, Your Honor. I mean, is it slant or what? I don't understand. Yeah. My clients actually did paint the porch. I can see that. Yeah, yeah. So there were some arguments over the porch and there were some issues with bathroom fixtures and, as you mentioned earlier, painting. I mean, my client's home, their marital home, was destroyed by fire. Now, the bathroom fixtures are in the first contract, in the contract, right? Correct. Yeah, it is. And this isn't that? That is. Okay, thank you. Okay. So ultimately, we believe that the trial court's judgment should be reversed and the case should be remanded with instructions to enter judgment actually on Mike Knight's counterclaim for the $25,000. We don't believe that there should be any attorney's fees awarded at all. If the court disagrees with that, we certainly believe that there should be no attorney's fees or contract interest assessed against Lou Anne Knight, who is not a party to any agreement that would allow it. Thank you. Thank you. Counsel? May I please report? Counsel? My name is Chris Custer and I'm from Taylor Law Offices in Eppingham and I represent Ed Wolf Construction. This was a fact-intensive contract case. A fact-intensive construction case. It wasn't a complex case. And frankly, in the end, it wasn't even a close case at the end. In fact, Mr. Garavaglia, who did not participate in the litigation or in the trial, he suggested that Judge McHaney's colorful or descriptive language is some sort of proof that the judgment was based upon passion or prejudice. That cannot be the farthest from the truth. Mr. Garavaglia suggested that somehow the record was portrayed to make the Knights look unreasonable or hypersensitive. The Knights did that. The Knights did that. We were in courtroom 303 in Salem for four days. Judge McHaney heard 16 witnesses. If you've ever tried a case in courtroom 303, it is like a large walk-in closet. I felt like I was in a football huddle for four days. And I'm not complaining, but my point is, when we talk about deference to the trial court and a trial judge's ability to see and observe the demeanor of the witnesses, past judgment of credibility, and believe me, credibility was a huge issue in this case, he had a front row seat. It was the first time I'd ever been in a courtroom at a trial where I never did have to ask for permission to approach the bench or the witness because we were already there. He saw it firsthand. And speaking of huddles, and I tried to come up with an analogy, and of course it's revolving and playing about the Boric Super Bowl, Judge McHaney was the referee who sat two feet from the action and where the penalty occurred. He had that insight. He had that ability. He also had the benefit of basically after we had four days of evidence in this fact-intensive case, Mr. Terlizzi and I agreed, Mr. Terlizzi represented the Knights, the defendants, co-plaintiffs, and I represented Ed Wolfe Construction, the plaintiff, counter-defendant. We presented him with written closing arguments. I had a transcript prepared each day of the trial. When I prepared my written closing arguments, I attached the transcript and made reference to the transcript. So unlike the referee in a football game who has to go look at a tiny monitor and has about a minute, Judge McHaney got to see the video. He heard both. He saw both plaintiffs' arguments in writing, and he saw the actual transcript, and he saw the quotes of the witnesses. So he had the best position to make judgment in this case, and he did. The case was filed in March of 2008. Four years, four years of discovery. Four days of trial, Judge McHaney made the exact correct decision. Again, we talk about deference to trial courts and the superior position and all of that. Whenever you have a bench trial, the winner of the bench trial stands up and says, You've got to listen to what the trial court says. He was in the best position. The loser of the bench trial says, No, no, it was based upon passion or prejudice. And we always cited that case law. You've had it pasted in your brief. But in this case, of all bench trials I've ever tried, this is a case that it means something. It resonates. This trial judge spent four days within an arm's length from the parties and the attorneys and the witnesses. Judge McHaney worked hard during the trial, and it wasn't based upon passion or prejudice. In fact, in his December 4, 2012 order, he says, This court carefully observed the demeanor and weighed the credibility of the witnesses and the parties. Mr. Wolf, he says, was completely credible. The testimony of Richard Knight can best be described as evasive. Was there some more colloquial language in that? That is an entertaining order, but it was right on point. You asked about the color changes. Judge McHaney, her ad nauseum from about all of the ridiculous and unreasonable changes that Mr. and Mrs. Knight made throughout this process. I did include a picture of before and after in my brief showing the front porch, for example. I have never seen a case where a party like Richard Knight was impeached. Not only was his credibility questioned, rightfully so, he was shown to be absolutely less than truthful and was caught in lies. I don't say those words very often in a court or an appellate court, saying someone lied. He lied. He was caught in several lies. And when Judge McHaney suggested that he was being less than evasive, that was being very, very generous. This was a moving target. They did sign a contract on March 7, Richard Knight and Wolf. There was a quantum error case. What happens in cases like this is construction companies call to the fire. They show up on the day of the fire, and they walk through it. You've seen the before picture. This was a very bad fire, sustained a lot of damage. So they give their best estimate, and they attached the estimate, and they did that. Richard Knight was two feet from me also. He admitted that he indeed signed the contract. And his wife. His wife did not sign the contract. And he also signed an authorization that says, by the way, if you request upgrades that were, it's not going to be covered by insurance, you have to pay me. And you have to pay attorney's fees. He signed all of those documents. And when Mr. Garavelli, again, he wasn't there. So he, it's difficult. But when we tried this case, and Mr. Turley and I argued the case in person and in closing written arguments, the judge heard it all, count one and count two. And there was no dissection or bifurcation of, well, these damages are under count one, these damages are under count two. That was never said. Interesting, too, there was never a suggestion or a point raised by Mr. Turley, on behalf of Mr. and Mrs. Knight, about her not signing the contract. I would submit that that issue would be waived to the extent it matters to the court. But that was never brought up. And this whole notion of court satisfaction on the front porch, that was also not brought up during the trial court. But you brought it up, Judge. The number of changes, and Mr. Wolf was the lead contractor. They bent over backwards. The testimony is clear. They hired professional contractors, subcontractors, including painters, Gary Reckin, and the concrete person, John Lewis. One of the untruths that Mr. Knight was caught in, he suggested that, keep in mind this is five months after they signed the contract. They decide they want a brand new big porch, the nice porch, covered by gables and a roof. Five months after the contract, these kinds of changes are still going on. These additions are still going on. So, Mr. Lewis, the contractor, very respected contractor in Eppingham. There's evidence in the record of that point. He and his son and Mr. McNelly, with Ed Wolf Instruction, they basically said, okay, here's the way this porch is going to be configured. We have the doorway, the front door. Do you want to step or do you not want to step? And they actually, they being Mr. Lewis and his son, took a pencil and drew it under the door well and said, this is where the concrete will stop and start. He did not want to step. Now, keep in mind, Mr. Knight had previously denied ever having a conversation. And Mr. McNelly and Mr. Lewis, they all said, oh, no, he was there. We showed him. We pointed it out. So, they poured these tons of concrete and built this wonderful front porch. Two days later, Mr. Knight and Mrs. Knight, like they had done in the past, they hate the porch. We are changing this front porch. And, again, the Wolf did nothing but try to please them and the harder they tried, the worse it was. So, what did they do? They tore out that big hunk of concrete and started over on the front porch. And then they had the audacity, the Knights, to try to get out of paying for it. Again, four months after the contract was signed, we're still getting these huge upgrades and betterments, I think we're referred to. And now they want it ripped out. They signed the little proposal. Their front porch is going to cost you $15,000. You need to spend $7,500 down, put $7,500 down, because we all know you didn't have a front porch before the fire. State Farm is not going to pay for your front porch. So, they paid $7,500, which was half of $15,000. And then when I asked Mr. Knight about why he believed that his check for $2,500 would be sufficient rather than the $7,500, he said that was our agreement. And I said, Mr. Knight, again, two feet away from the big walk-in closet, is it just coincidence that it says $15,000? They required you to pay half, $7,500 is half. And how was it that you're paying $7,500 and that was half? He actually said, I think it's coincidence, I don't know. That was just one of the untruths that he was caught in. Another one, and Mr. Garibaldi had me referenced to it in his argument. Mr. Knight, on January 31, actually, left a voicemail on my client's machine. It was not a very nice voicemail. And it basically said, listen, you're done, you're out of here, you don't get a chance to fix the punch list or complete the work. Because you're charging me the interest at 1.5%, which is the interest that was in the contract. And then again, I had Mr. Knight read out loud and said, this is in the contract, this is your signature, yes, yes, yes, yes, yes. But interestingly, and we put up in a transcript the voicemail. He had denied earlier in the trial that he had left the voicemail. And then there was some suggestion based upon the manner in which he was speaking that he was drunk. And Mr. Trulizzi rejected it. I think before Judge McHaney could rule on the objection, he said, well, I know I wasn't drinking that night. I don't remember the conversation, but I know I wasn't drinking that night. So those were just a few, just a few bits of pieces of that trial where Mr. Knight completely impeached himself. It wasn't the judge had anything out for him. It wasn't us. He did it to himself. In fact, with regard to Mrs. Knight, Judge McHaney indicated that she does seem more credible. And she did. The interesting thing about Mrs. Knight, though, is that, again, we were the plaintiff. They didn't pay their bill. They countersued us for like $80,000. So supposedly they owe us nothing and we owe them $80,000. Well, when we get Mrs. Knight on the stand, and I'm cross-examining her, she admits, she admits under oath during the trial, two feet away, I realize we still owe Wolf Construction money. She was credible. She was more credible. And Judge McHaney indicated such. Mr. Knight was completely incredible, unbelievable, and that's – and Judge McHaney had a front-row seat to see just that. Last week I was caught on the, you know, snowstorm in the South, dragged through the mountains on the smoky side. I don't want to do that again. So I'm going to wrap this up. But I will say in closing, the Knights took sort of a shotgun approach at this appeal. First they said there is no contract. Now, that's interesting because they countersued us on the contract and suggested we breached warranty. You can't have it both ways. There wasn't, and there was certainly a contract. The judge did not insert missing terms to this contract. We've talked about the Porsche. We've talked about all of the – and some other improvements. You asked, Justice, about the painting. Gary Redding, who is a professional painter – Did he testify? He testified. Yes, he did. And they painted the – I believe it was the entire upstairs, painted the living room. And Mrs. Knight and her friend came by that day and they said they love the colors. They said, finally we have some color. They picked them out. They saw the walls painted already. They loved it for whatever reason. Now, you say they picked them out. Who picked out the color? Mrs. Knight. And they looked at the swatches and they did all that. And then again, the recce and his crew had painted many rooms upstairs, almost painted, and they were painting the living room. They said it was great. They came back the next day. It was all wrong. It was all wrong. It had to be redone. And I don't know how Mr. Wolf did it. I don't know how his foreman, Steve McNally, did it. Instead of just saying, I'm done with this, you guys are impossible to please, they called the recce's back and said, hey, can you come back? If you really want to and need to go back to the record and listen to the testimony and read the other testimony of the other subs, they couldn't believe it either. They said, these guys were impossible to please, but they kept changing things, and all the Wolves did was try to please them. And they probably shouldn't have tried, but they did. Until I got kicked off of the project. You'll hear from the electrician regarding Mrs. Knight. She changed her mind three times on the light fixture, and they moved it three times. So when Mr. Garavaglia states in his brief, again, he wasn't there, I understand, but he talks about, or complains about time. This was a never-ending project. They kept changing, it was a moving target. It certainly wasn't anything to do with regard to Wolf that had the delays. On the light fixture, that was an add-on, different light, or is that a... That was part of the contract. That was in the contract. The interesting thing is, you asked about colorful language. Joseph Dawson, or Mr. Dawson, they hired an expert to go in, and that report that Judge McKinney says belongs on the bottom of a birdcage, was fantasy. It was fantasy land, and just so you get a bit of an idea, when I came into this case, it was about four months before the trial, the original attorney got sick, and he asked me to go try the case. He said, if you're going to continue, so I will, so we did. This expert had not been deposed, so we agreed, we need to go take this expert's deposition, and we did that. Whenever I take an expert's deposition, I generally like to have his file, I have all of the parts of the case that he relied upon in formulating his conclusions. Well, they never provided it, and then I learned at the deposition that it was on a computer, and it somehow crashed. He transferred it to a second computer, and it somehow crashed. I mean, it was just the most amazing story I've ever heard. He wasn't paid a dime. He wasn't paid a dime. So, he had an interest in this lawsuit, and when I asked him, how do you expect to get paid? I think he made some reference, only God knows that. I mean, the JEDCO gentleman that was brought in by State Farm to figure out what's going on in this mess, and keep in mind, keep in mind, this is three years after the fire. The State Farm guy came in, who was their witness. I'm cross-examining their witness on the second day of trial, and Mr. Dawson's ARCH report came up, and he sort of, it was called the ARCH report. That's the one that belongs on the bottom of a birdcage. He chuckled. He goes, I better not go there. And Mr. Terlizzi was asking me the questions at the time, so it was my turn to cross-examine him. I said, perhaps we should go there, Mr. Paul. Why did you chuckle when Mr. Terlizzi asked you about the ARCH report? He said, I have read a lot of reports in my day. He was a construction expert. He said, that was a story. That was fantasy. It was trumped up. It was exaggerated. Those were the words used in court. And then, so I mean, that report, Judge McKinney, as a, fulfilling his role as a gatekeeper, absolutely should have kept that out. Another thing, too, with regard to Mr. Paul, again, Knight's witness, Knight's witness. You know, we talk about, was there substantial performance of the contract? Of course there was. He said, there were some minor defects or deviations, but Wolf did good work. And I asked him, well, if he would have been kicked off the job, do you think Wolf would have been able to complete the punch list of items? He said, absolutely. These minor deviations, they were on the punch list? Correct. And the record is undisputed that after the voicemail call, after they were kicked off, they were not allowed to fix those. And they would have been easy fixes. Thank you. Thank you. Mr. Bob? Mr. Bob? A couple of things, Your Honors. The notion that the contract, never having been signed by Lou Anne Knight, not coming up until the appeal is simply not true. The contract is a matter of record. Both the authorization to perform services and the authorization to repair only bear the signature of Richard Knight. Now, this was or was not brought up in the trial court? The issue of whether or not it was signed? The signatures? The document itself was entered, I don't recall the record, argued in the record over a lack of signature by Lou Anne Knight, but it's an undisputed matter in the record that it only bears Richard Knight's signature. It's apparent on the document itself. And the same can be said with the check that we believe is the basis for the affordable satisfaction. It's clearly indicated that it's a final payment for the ward gentleman. And what is the standard review? What do you feel is the standard review in this case? Well, on all but the attorney's fees issues, we believe it's whether or not the trial court's decision is against the manifest way to the evidence. We believe that attorney's fees should be reviewed under an abuse of discretion standard. I do just want to comment briefly. Even if the court, even if this court, is willing to assume or accept the trial court's decision, determination that the Knights were extremely unreasonable, and that the Arch report was intemperate, I would again ask the court not to forget that State Farms expert engineer Brian Weinmeier, Joseph Paul, who also, I think even Mr. Kester conceded, mentioned that the Knights were perhaps hard to please at times, found problems with the work performed by Wolf. Mr. Paul, in round numbers, estimated that the workmanship issue totaled about $39,000. There was other evidence that my clients had actually paid to have some work done to repair the hanging of certain doors. It was roughly $6,000. And I would mention again that State Farm actually reissued a check that was formally payable to Wolf, to my clients, after reviewing the report done by the engineer, Mr. Weinmeier, and the report of Mr. Paul. So it's not simply only the case that the Wolfs were particular unreasonable, and it's not only the case that Wolfs did a bad job at this. There's some evidence, and partial evidence, we believe in the record, to support a reversal of the court's decision. Thank you. Thank you. The case will be given our advice, but we'll be advised upon us reaching a decision.